Filed 8/28/14  P. v. Steele CA5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | F067154 |
| v. | (Super. Ct. No. CF06904028) |
| BRODERICK JEROME STEELE, | **O P I N I O N** |
| Defendant and Appellant. | |

### THE COURT*

APPEAL from a judgment of the Superior Court of Fresno County.  Jonathan M. Skiles, Judge.

Rachel Lederman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Harry Joseph Colombo, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\*        Before Gomes, Acting P.J., Detjen, J., and Franson, J.

Broderick Jerome Steele appeals from an order extending his civil commitment as a mentally disordered offender (MDO). He contends there was insufficient evidence that he was currently dangerous and that his severe mental disorder caused serious difficulty in controlling dangerous behavior. We conclude the evidence was sufficient and affirm the trial court's order extending his commitment.

## FACTS

### The Report

The only evidence before the court at the recommitment hearing was the report submitted on November 1, 2012, by the medical director of Atascadero State Hospital. He was of the opinion that Steele qualified for continued treatment under Penal Code section 2970,[1] and he recommended that the district attorney file a petition for another year of continued treatment. He attached a forensic report to support his opinion.

The forensic report, written by psychologist Dr. Perry, stated that Steele had a severe mental disorder as defined in section 2962. He suffered from auditory hallucinations (including commands to kill others), persecutory delusions, grandiose delusions, paranoia, mood lability, and racing thoughts. His symptoms, consistent with Schizoaffective Disorder, Bipolar Type, had "caused substantial impairments in his perception of reality, thought processes, emotional functioning, and behavior."

Dr. Perry stated that in July and August of 2012, Steele engaged in the following behaviors.[2] He claimed to work for the FBI, accused a staff member of attacking him and trying to choke him, and stated that staff members were trying to poison him. In a delusional and agitated state, he told a staff member, "'You're KKK, you're the white devil, you want to kill all black people!'" He said he believed staff members were going

---

[1]     All statutory references are to the Penal Code unless otherwise noted.

[2]     The report reviewed the year beginning on June 13, 2012.

2

to choke and kill him.  He was hyperverbal and intrusive.  He made threats of harm to others.  He stated, "'I know you're trying to kill me, the white man must die!'"  He approached staff in an aggressive manner and stated, "'You're going to pay for fucking with me, you motherfucker.'"  He was placed in seclusion because he was a danger to others.  He instigated an argument with a peer while assuming an aggressive posture, which required staff to activate an alarm to summon support.

Dr. Perry explained that in July 2012, Steele was placed on an involuntary medication order for being a danger to others.  Since August 2012, Steele's symptoms had been controlled with medication and his severe mental disorder was in remission; however, it could not be kept in remission without treatment.

According to Dr. Perry, Steele's aggressive behaviors demonstrated he would be at an increased risk for future violence if his symptoms were not sufficiently controlled.  He lacked insight into his mental illness and his need for treatment, he remained on an involuntary medication order, and he refused to attend 60 percent of his assigned therapy groups.  He was unlikely to seek appropriate mental health care in the community, and without appropriate treatment, his symptoms were likely to become worse and elevate his violence risk.

Dr. Perry concluded that Steele had a severe mental disorder as defined in section 2962; his disorder could not be kept in remission without treatment; and as a result of his disorder, he represented a substantial danger of physical harm to others.

***The Ruling***

After considering this evidence and hearing argument from both counsel, the court made the following ruling:

> "The only evidence before the Court is the report ….  [¶]  The opinion of the doctors authoring that report has Mr. Steele experiencing auditory hallucinations that include demons or others commanding him to

3

kill, as well as other symptomatology. That apparently is being controlled through medication.

"But the report also documents that that is something that Mr. Steele is not voluntarily complying with. And the opinion is that given that disorder, that he would pose a substantial risk of danger and harm to others due to that mental disorder.

"Based on what is in that report, the Court finds that Mr. Steele is a person described in Penal Code Section 2962, that he does have a severe mental disorder that cannot be kept [in] remission [if] treatment is not continued, and that by reason of his mental disorder, he represents a substantial danger of physical harm to others.

"The Court is ordering that Mr. Steele be committed to the Department of Mental Health at Atascadero State Hospital pursuant to [section] 2970."

## DISCUSSION

"'The Mentally Disordered Offender Act (MDO Act), enacted in 1985, requires that offenders who have been convicted of violent crimes related to their mental disorders, and who continue to pose a danger to society, receive mental health treatment … until their mental disorder can be kept in remission. [Citation.]' [Citation.]" (*Lopez v. Superior Court* (2010) 50 Cal.4th 1055, 1061 (*Lopez*), disapproved on another point in *People v. Harrison* (2013) 57 Cal.4th 1211.) "Commitment as an MDO is not indefinite; instead, '[a]n MDO is committed for … one-year period[s] and thereafter has the right to be released unless the People prove beyond a reasonable doubt that he or she should be recommitted for another year.' [Citation.]" (*Id.* at p. 1063.)

To obtain an extension of one year, the People must prove that (1) the person continues to have a severe mental disorder; (2) the person's mental disorder is not in remission or cannot be kept in remission without treatment; and (3) because of his mental disorder, the person continues to represent a substantial danger of physical harm to others. (§ 2972, subd. (c); *Lopez, supra,* 50 Cal.4th at p. 1063; *People v. Beeson* (2002) 99 Cal.App.4th 1393, 1398-1399.) Furthermore, an involuntary civil commitment

4

requires proof that the person's mental disorder causes serious difficulty in controlling dangerous behavior (*In re Howard N.* (2005) 35 Cal.4th 117, 122), "in order to distinguish those persons who are subject to civil commitment from those persons more properly dealt with by the criminal law" (*id.* at p. 132). A mental health professional "may and should take into account the prisoner's entire history in making an MDO evaluation. This includes prior violent offenses as well as the prisoner's mental health history." (*People v. Pace* (1994) 27 Cal.App.4th 795, 799.)

"In considering the sufficiency of the evidence to support MDO findings, an appellate court must determine whether, on the whole record, a rational trier of fact could have found that defendant is an MDO beyond a reasonable doubt, considering all the evidence in the light which is most favorable to the People, and drawing all inferences the trier could reasonably have made to support the finding. [Citation.] ""'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the [finding] is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder….' [Citation.]'" [Citations.]" (*People v. Clark* (2000) 82 Cal.App.4th 1072, 1082-1083.)

Steele maintains that Dr. Perry's prediction that he would go off his medication, thereby elevating his violence risk, was pure speculation. But substantial danger may be proven by the predictions of mental health experts. (*In re Qawi* (2004) 32 Cal.4th 1, 24 (*Qawi*) [substantial danger of physical harm to others "appears to mean a prediction of future dangerousness by mental health professionals"].) "In civil commitment cases, where the trier of fact is required by statute to determine whether a person is dangerous or

5

likely to be dangerous, expert prediction may be the only evidence available. [Citations.]"  (*People v. Ward* (1999) 71 Cal.App.4th 368, 374.)

Steele also asserts that Dr. Perry's conclusion was not based on any physically dangerous behavior in the past year.  The MDO Act, however, specifically states that a "'substantial danger of physical harm' does not require proof of a recent overt act." (§ 2962, subd. (f); see *Qawi, supra,* 32 Cal.4th at p. 24.)  Moreover, Steele's lack of recent violence in a controlled institutional setting does not prove he no longer represents a substantial danger to others when placed outside that controlled setting.  (*People v. Sumahit* (2005) 128 Cal.App.4th 347, 353.)

Steele argues that Dr. Perry did not expressly opine that Steele's mental disorder caused him serious difficulty in controlling his dangerous behavior, and there was no evidence to support such a finding.  On the first point, Dr. Perry did opine that Steele's symptoms "caused substantial impairments in his perception of reality, thought processes, emotional functioning, and behavior."  And more importantly, the evidence established that Steele was delusional, paranoid, and aggressive.  He accused the staff of trying to choke, poison, and kill him.  He engaged in threatening or aggressive behavior toward both staff and peer.  He was separated from the population because he presented a danger to others.  He refused to take his medication and refused to participate in most of his therapy sessions.  He lacked insight into his mental illness and his need for treatment. The order to involuntary medicate him was made because he was a danger to others. Once he was involuntarily medicated, his behavior improved, but Dr. Perry believed he was unlikely to continue his treatment if released from the hospital.  Without medication, his remission would end and he would be at an increased risk of future violence.  From this evidence, we conclude substantial evidence supported a finding that Steele's mental disorder had caused him serious difficulty in controlling his dangerous behavior and would do so again if he were released, and that his past dangerous behavior and the

6

symptoms of his mental illness created a substantial risk he would physically harm others.  We find no error in the trial court's recommitment order.

## DISPOSITION

The order is affirmed.